Slip Op. 17-54

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TMK IPSCO ET AL.,**<br><br>    **Plaintiffs and Consolidated Plaintiffs,**<br><br>  **and**<br><br>**MAVERICK TUBE CORPORATION ET AL.,**<br><br>    **Plaintiff-Intervenors and Consolidated**<br>    **Plaintiff-Intervenors,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>    **Defendant,**<br><br>  **and**<br><br>**TIANJIN PIPE (GROUP) CORP. AND TIANJIN**<br>**PIPE INTERNATIONAL ECONOMIC &**<br>**TRADING CORP.,**<br><br>    **Defendant-Intervenors and**<br>    **Consolidated Defendant-Intervenors.** | **Before: Claire R. Kelly, Judge**<br><br> **Consol. Court No. 10-00055** |

## <u>OPINION</u>

[Sustaining the remand results issued by the U.S. Department of Commerce concerning its final determination in the countervailing duty investigation of certain oil country tubular goods from the People's Republic of China.]

Dated: May 3, 2017

<u>Roger Brian Schagrin</u>, <u>Christopher Todd Cloutier</u>, <u>John Winthrop Bohn</u>, <u>Jordan Charles Kahn</u>, and <u>Paul Wright Jameson</u>, Schagrin Associates, of Washington, DC, for plaintiffs and consolidated plaintiff-intervenors TMK IPSCO, V&M Star L.P., Wheatland Tube Corp., Evraz Rocky Mountain Steel, and United Steelworkers.

Alan Hayden Price and Robert Edward DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, for consolidated plaintiff and consolidated plaintiff-intervenor Maverick Tube Corporation.

Debbie Leilani Shon, Jon David Corey, Jonathan Gordon Cooper, and Kelsey Marie Rule, Quinn Emanuel Urquhart & Sullivan, LLP, of Washington, DC, for consolidated plaintiff and consolidated plaintiff-intervenor United States Steel Corporation.

Loren Misha Preheim, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of Washington, DC. for defendant.  With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Shelby Mitchell Anderson, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance, of Washington, DC.

Daniel Lewis Porter, William Henry Barringer, and Matthew Paul McCullough, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for defendant-intervenors and consolidated defendant-intervenors.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Department" or "Commerce") Final Results of Redetermination Pursuant to Court Remand filed pursuant to the court's decision in TMK IPSCO v. United States, 40 CIT __, __, 179 F. Supp. 3d 1328 (2016).  See Final Results of Redetermination Pursuant to Court Remand, Dec. 21, 2016, ECF No. 171 ("Remand Results").  The court remanded Commerce's final determination in its countervailing duty ("CVD") investigation of certain oil country tubular goods ("OCTG") from the People's Republic of China ("China") to explain or reconsider its determinations: (1) to use China's World Trade Organization ("WTO") accession date as a cut-off for identifying and measuring countervailable subsidies; (2) to include two disparate freight rates in Commerce's benchmark price for the benefit conferred by the provision of steel rounds for less than adequate remuneration ("LTAR") as representative of what an importer would pay; (3) to attribute subsidies received by Changbao Precision Steel Tube Co., Ltd. ("Precision") to its parent company

Jiangsu Changbao Steel Tube Co., Ltd. ("Changbao") and to all of Changbao's other

subsidiaries; (4) to attribute subsidies received by four subsidiaries of Tianjin Pipe (Group)

Corp. ("TPCO") to sales of other subsidiaries of TPCO; (5) that the provision of steel

rounds and billets at LTAR is tied to sales of seamless steel pipe; and (6) to include the

Steel Business Briefing ("SBB") "East Asia" benchmark data for billets in the benchmark

calculation for the provision of steel rounds and billets.  See TMK IPSCO, 40 CIT at __,

179 F. Supp. 3d at 1335; see generally Certain Oil Country Tubular Goods From the

People's Republic of China, 74 Fed. Reg. 64,045 (Dep't Commerce Dec. 7, 2009) (final

affirmative countervailing duty determination, final negative critical circumstances

determination) ("Final Results") and accompanying Issues and Decision Memorandum

for the Final Determination in the Countervailing Duty Investigation of Certain Oil Country

Tubular Goods ("OCTG") from the People's Republic of China, PD 318 (Nov. 23, 2009)

("Final Decision Memo").[1]   Commerce's Remand Results adequately address the

concerns raised in the court's prior decision, and Commerce's revised results are

supported by substantial evidence.  Therefore, the Remand Results are sustained.

---

[1] On May 12, 2010, Defendant submitted indices to the public and confidential administrative records for its final results, which identify the documents that comprise the public and confidential administrative records to the Commerce's final determination.  The indices to the public and confidential administrative records to Commerce's final determination can be located at ECF No. 40.  On January 3, 2017, Defendant submitted indices to the public and confidential administrative records for its Remand Results, which identify documents that comprise the public and confidential administrative records to Commerce's Remand Results.  Those indices can be located at ECF Nos. 173-1 and 173-2, respectively.  All further references to the documents from the administrative records to the final results and the remand results are identified by the numbers assigned by Commerce in these administrative records.

## BACKGROUND

The court presumes familiarity with the facts as discussed in <u>TMK IPSCO</u>. Nevertheless, the court briefly summarizes facts relevant to the discussion here for ease of reference.  First, in its final determination, Commerce declined to identify and measure non-recurring subsidies alleged in the petition to have predated China's accession to the WTO on December 11, 2001 because Commerce concluded that it could not identify and measure subsidies prior to that date.  <u>See</u> Final Decision Memo at 53.  The court held that Commerce did not articulate a relationship between China's WTO accession date and the implementation of reforms that would enable Commerce to identify and measure countervailable subsidies.  <u>TMK IPSCO</u>, 40 CIT at __, 179 F. Supp. 3d at 1343. Therefore, the court held that Commerce failed to countervail all identifiable and measurable subsidies, as the statute requires it to do.  <u>See id.</u>; <u>see generally</u> Section 701(f) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671(f)(1)–(2) (2012).[2]  The court remanded to Commerce to

> investigate each subsidy program and allocate subsidies beginning on the first date it could identify and measure the subsidy considering the particular program in question and the impact of relevant economic reforms on that program.

<u>TMK IPSCO</u>, 40 CIT at __, 179 F. Supp. 3d at 1344.

---

[2] Although this countervailing duty investigation was initiated on April 28, 2009, the 2012 version of 19 U.S.C. § 1671(f) applies here because the March 13, 2012 amendment to the statute applies to all countervailing duty proceedings initiated on or after November 20, 2006 and all civil actions relating to such proceedings.  <u>See</u> Section 701 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671 note (2012) (Effective and Applicability Provisions 2012 Acts).  All further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition unless otherwise indicated.

Second, Commerce included ocean freight quotes from both Maersk and an unaffiliated freight forwarder used by mandatory respondent Zhejiang Jianli Enterprise Co., Ltd. ("Jianli") to generate an average price for ocean freight in calculating its world market price benchmark to measure the adequacy of remuneration for steel rounds provided to Jianli in its final determination. See Final Decision Memo at 84. The court remanded the issue to Commerce to reconsider or further explain its decision to use an average of these two freight quotes because Commerce had inadequately explained how both quotes could be representative given the significant disparity between them. See TMK IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1350–51.

Third, Commerce included monthly export pricing data for billets from SBB "East Asia" among the data included in its benchmark calculation for determining the adequacy of remuneration of the provision of steel rounds and billets in its final determination. See Final Decision Memo at 77. The court granted Commerce's request for a remand to allow it to reconsider its determination to include the SBB "East Asia" series pricing data in its benchmark calculation. See TMK IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1347.

Fourth, Commerce attributed subsidies received by Precision to Changbao, Precision's parent company, and to all of Changbao's other subsidiaries. See Final Decision Memo at 8. Commerce likewise attributed or cumulated subsidies received by four of TPCO's subsidiaries to the consolidated sales of TPCO and all of its subsidiaries. See Final Decision Memo at 9 (citing Certain Oil Country Tubular Goods From the People's Republic of China, 74 Fed. Reg. 47,210, 47,215 (Dep't Commerce Sept. 15, 2009) (preliminary affirmative countervailing duty determination, preliminary negative

critical circumstances determination) ("Prelim. Results").  The court held that 19 C.F.R.

§ 351.525(b)(6)(iii) (2009)[3] does not give Commerce authority to attribute subsidies

received by a subsidiary to the consolidated sales of the parent company's other

subsidiaries.  TMK IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1357.  The court remanded

to Commerce to explain what other authority allows it to attribute subsidies received by

certain subsidiaries of Changbao and TPCO to the consolidated sales of all subsidiaries

of each respective company or reconsider its determination.  Id., 40 CIT at __, 179 F.

Supp. 3d at 1358.

    Lastly, in its final determination, Commerce attributed the provision of steel rounds

to TPCO's consolidated sales of all merchandise, not just to its sales of seamless steel

pipe products.  See Final Decision Memo 128–29.  The court held that Commerce's

attribution decision is not supported by substantial evidence because the court could not

"discern whether Commerce determined that the provision of steel rounds at LTAR is tied

to sales of seamless pipe."  TMK IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1359.  The

court remanded Commerce's determination to determine whether its tying regulation

applies to TPCO and support its determination with record evidence.  See id.

    In its remand determination Commerce makes the following determinations.

Under protest, Commerce no longer adopts China's WTO accession date as a uniform

date when subsidy programs were identifiable and measurable in China.[4]  See Remand

---

[3] Further references to the Code of Federal Regulations are to the 2009 edition.

[4] The Court of Appeals for the Federal Circuit held that Defendant may preserve its standing to pursue an appeal even though Defendant may technically be the prevailing party by adopting a position "under protest".  See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

Results 11.  Instead, Commerce identified four categories of programs alleged in the petition to assess when "a sufficiently developed legal framework relevant" to each existed such that Commerce could appropriately evaluate whether a subsidy had been bestowed.  See Remand Results 11, 13–19.  Commerce applies the benefit conferred on the earliest date when the government bestowal was identifiable or measurable.  See id. at 31–35. Commerce continues to use the ocean freight quotes provided by Maersk and by Jianli's freight forwarder.  See id. at 42.  Commerce reverses its prior conclusion regarding the attribution of subsidies received by TPCO's and Changbao's subsidiaries. See id. at 38–39.  Commerce maintains its determination to attribute steel rounds and billets provided at LTAR program to TPCO's applicable total sales and not solely to sales of seamless steel pipe.  See id. at 46.  Finally, Commerce excludes the SBB East Asia pricing data from its benchmark calculation for steel rounds.  See id. at 48.

Commerce's changes in approach resulted in revised subsidy rates for all mandatory respondents and for all respondents not individually investigated.  See Remand Results 56.  On remand, Commerce assigned mandatory respondents the following subsidy rates: (1) Changbao a subsidy rate of 28.70%; (2) Jianli a subsidy rate of 30.56%; (3) TPCO a subsidy rate of 21.48%; (4) Wuxi a subsidy rate of 29.48%.  Id. For all other exporters not individually investigated, Commerce assigned a subsidy rate of 27.08%.

## STANDARD OF REVIEW

The court continues to have jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2006), which grant the court authority to review actions

contesting the final determination in an investigation of a CVD order.  <u>See</u> 19 U.S.C.

§ 1516a(a)(2)(B)(i); 28 U.S.C. § 1581(c) (2012).   "The court shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

"The results of a redetermination pursuant to court remand are also reviewed 'for

compliance with the court's remand order.'"   <u>Xinjiamei Furniture (Zhangzhou) Co. v.</u>

<u>United States</u>, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting <u>Nakornthai</u>

<u>Strip Mill Public Co. v. United States</u>, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306

(2008)).

## DISCUSSION

### I.  Commerce's Evaluation of Non-Recurring Subsidy Programs

In <u>TMK IPSCO</u>, the court held that by cutting off its investigation and measurement

of subsidies on December 11, 2001, the date China acceded to the WTO, Commerce had

failed to countervail all identifiable and measurable subsidies, as the statute requires it to

do.  <u>See id.</u>; <u>see generally</u> 19 U.S.C. § 1671(f)(1)–(2).  The court remanded to Commerce

to investigate each subsidy program and allocate subsidies beginning on the first date it

could identify and measure the subsidy considering the particular program in question

and the impact of relevant economic reforms on that program.  <u>TMK IPSCO</u>, 40 CIT at

__, 179 F. Supp. 3d at 1344.  Consolidated Plaintiff, United States Steel Corporation

("U.S. Steel"), contends that Commerce's determination on remand to evaluate the

subsidy programs in the petition by type of program does not comply with the court's order

that Commerce investigate "each subsidy program and allocate subsidies beginning on

the first date it could identify and measure the subsidy considering the particular program in question."   United States Steel Corporation's Comments Def.'s Final Results of Redetermination Pursuant to Remand Order 3–6, Jan. 23, 2017, ECF. No. 174 ("U.S. Steel Remand Comments").   Alternatively, U.S. Steel argues even if Commerce's approach of evaluating subsidy programs by type is legally supported, Commerce's conclusions about when credit-oriented subsidy programs and land-oriented subsidy programs were first identifiable and measurable are unsupported by substantial evidence. U.S. Steel Remand Comments 6–7.   Commerce's evaluation of subsidy programs in this investigation is reasonable and consistent with its statutory obligations.   Commerce's conclusions as to when credit-oriented and land-oriented subsidy programs were first identifiable and measurable are also supported by substantial evidence.

Commerce generally must impose countervailing duties on merchandise from a non-market economy ("NME") country if Commerce makes the findings necessary to countervail a subsidy more generally under the statute.   See 19 U.S.C. § 1671(f)(1) (2012); see also 19 U.S.C. §§ 1677(5)–(5A) (2006) (setting forth the determinations Commerce must make before imposing a CVD generally).   However, Commerce need not countervail a subsidy imported from a NME country if Commerce determines it cannot identify and measure the subsidy in question "because the economy of that country is essentially comprised of a single entity."   See 19 U.S.C. § 1671(f)(2) (2012).   Commerce has significant discretion in determining whether it can identify and measure subsidies provided by the government or a public entity within the NME country because the statute is silent as to when Commerce can identify and measure a subsidy.   See 19 U.S.C.

§ 1671(f)(1)–(2) (2012).   Normally, a reviewing court should not disrupt the agency's exercise of discretion in fashioning an approach to a problem delegated to it unless the agency has not supplied a reasoned basis for its action.   See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citations omitted). Nonetheless, the "agency must cogently explain why it has exercised its discretion in a given manner."   Id. at 48 (citations omitted).

On remand Commerce articulated a rational relationship between specific legal reforms in China and the effect of such reforms on Commerce's ability to identify and measure subsidies.[5]   See Remand Results 13–19.   Commerce "assessed when a sufficiently developed legal framework relevant to th[e] particular type of subsidy existed that would enable [it] to identify the sphere of commercial activity involved, the economic actors involved and the government action required to bestow that type of subsidy."   Id. at 11.   Commerce identified four types of subsidies alleged in the petition: grants, credit-oriented subsidies, tax-related subsidies and land-oriented subsidies.   See id. at 11–19. Commerce explained that it evaluated each type of non-recurring subsidy to determine when China first developed a sufficient "legal framework relevant to that particular type of subsidy . . . that would enable [it] to identify the sphere of commercial activity involved, the economic actors involved and the government action required to bestow that type of subsidy."   Remand Results 11.

---

[5] Commerce only evaluated the countervailability of programs that provided a non-recurring benefit as early as 1994 because it only allocates the benefit conferred of a non-recurring subsidy program over the average useful life of the assets involved.   See 19 C.F.R. § 351.401(a)–(b).   The average useful life of the assets used in the production of subject merchandise was 15 years. Remand Results 12.

Commerce determined that grant programs could first be identified and measured as of 1994.  Id. at 14.  Commerce reasoned that the first Company Law took effect in 1994, which marks a point "where distinct economic actors were legally extended the flexibility to engage in commercial activity" for the first time.  Id.  Commerce concluded that credit-oriented subsidies could be identified and measured starting from 1996, which Commerce grounded in two economic reforms: the 1995 Commercial Bank Law and the 1996 General Rules on Loans.  Id. at 15–16.  Commerce deduced that the former reform defined a commercial bank, made commercial banks legally responsible for their own profits and losses, and afforded commercial banks legal autonomy from the state in certain matters.  Id. at 15.  Commerce resolved that the General Rules on Loans set out legal rights and obligations for lenders and borrowers.  Id. at 15–16.  Commerce concluded that both reforms were necessary to "identify distinct legal economic actors in the credit market as well as to examine specific loans and potential forgiveness of such loans."  Id. at 16.  Commerce determined that "it may have been able to evaluate the countervailability of tax-related subsidies" starting from 1994.  Id. at 18.  Commerce supported its decision by highlighting that before the entry into force of a series of tax laws, including regulations regarding the value-added tax, consumption taxes, business taxes, enterprise income taxes, individual income taxes, and resources, China lacked a comprehensive legal framework that would be necessary to identify tax payers and assess and collect taxes.  Id. at 16.  Commerce also explained that the adoption of the Foreign Trade Law on May 12, 1994 allowed all individuals and legal persons to engage in foreign trade, which had been restricted to a monopoly of state-trading enterprises

managed by a Chinese government ministry before the Foreign Trade Law took effect.

<u>Remand Results</u> 17.   Therefore, Commerce implied that, prior to the adoption of the

Foreign Trade Law, individual actors could not have taken advantage of certain tax-

related subsidies.   <u>See</u> <u>id.</u>  Lastly, Commerce discerned that it could identify and measure

land-oriented subsidies as of 1999.   <u>Id.</u> at 19.   Commerce resolved that until 1999, the

year that both the Revised Land Administration Law and its implementing regulations

came into effect, the Chinese government had not established the legal framework for the

basic elements of land transactions.   <u>See</u> <u>id.</u>   Therefore, Commerce has articulated a

logical relationship between specific types of Chinese reforms and the legal conditions

necessary to permit Commerce to identify and measure countervailable subsidies for

individual actors within the Chinese economy.

   For programs that Commerce determined were established prior to December 11,

2001, Commerce next proceeded to consider each specific subsidy program alleged in

the petition to determine the extent to which any investigated programs may have

provided a benefit prior to December 11, 2001.[6]   <u>See</u> <u>id.</u> at 19–35.   Depending upon the

---

[6] Commerce did not change its determination with respect to the identification and measurement of certain non-recurring subsidy programs that it determined based on record information had been established after December 11, 2001 because the full benefit conferred by such programs had already been assessed and applied in Commerce's final determination.  <u>See</u> <u>Remand Results</u> 20–25.

   Specifically, the subsidy programs that Commerce determined were unaffected by its application of the December 11, 2001 cut-off date include: (1) Tianjin Binhai New Area; (2) the Tianjin Economic and Technological Development Area (Science and Technology Fund); (3) the Sub-central Government Programs to Promote Famous Export Brands and China World Top Brands; (4) the Jiangsu Province Brands; (5) the Stamp Exemption on Share Transfers Under Non-Tradeable Share Reform: (6) the Foreign Trade Development Fund (Northeast Revitalization

(footnote continued)

extent of the information available on the record, Commerce determined that each

program conferred a benefit either based on facts otherwise available or adverse facts

available ("AFA") because neither the Government of China ("GOC") nor the mandatory

respondents responded to additional questionnaires issued by Commerce.[7]   See

Remand Results 25–29.   Although Commerce analyzed the programs by creating

categories, Commerce grouped programs together by category because it concluded that

the nature of the government bestowals are similar for the individual programs examined

under each type.[8]   See id. at 50.   Commerce states that "[t]he next step in the process

---

Program); (7) the Five Points, One Line Program; (8) the Forgiveness of Tax Arrears For
Enterprises in the Old Industrial of Northeast China; (9) the Debt-to-Equity Swap for Pangang;
(10) the Bohai Fund's equity infusion in TPCO; (11) the Exemptions for State Owned Enterprises
from Distributing Dividents to the State; (12) all lending programs offered through government
entities; and (13) the VAT and Tariff Exemptions for the Purchase of Fixed Assets Under the
Foreign Trade Development Fund.  See id.

[7] Although 19 U.S.C. § 1677e(a)–(b) and 19 C.F.R. § 351.308(a)–(c) each separately provide for
the use of facts otherwise available and the subsequent application of an adverse inference to
those facts, Commerce uses the shorthand term "adverse facts available" or "AFA" to refer to
Commerce's use of such facts otherwise available with an adverse inference.  See, e.g., Remand
Results 27–35.

     Commerce requested information regarding the alleged subsidy programs for other
programs alleged in the petition for which it lacked information to determine whether they had
begun prior to December 11, 2001 by sending questionnaires to the Government of China
("GOC") and to the mandatory respondents.  See id. at 4 (citing Letter Pertaining to GOC
Questionnaire, Rem. PD 2, bar code 3490597-01 (July 25, 2016); Letter Pertaining to Jianli
Questionnaire, Rem PD 3, bar code 3490598-01 (July 25, 2016); Letter Pertaining to TPCO
Questionnaire, Rem. PD 4, bar code 3490600-01 (July 25, 2016); Letter Pertaining to Wuxi
Questionnaire, Rem. PD 5, bar code 3490602-01 (July 25, 2016)).  Commerce states that it
received no responses to its request for information.  Remand Results 19 (citing Memorandum
Pertaining to Changbao, Jianli, TPCO, Wuxi Status of Respondent Representation, Rem. PD 7,
bar code 3591043-01 (July 27, 2016)).  As a result, Commerce based its CVD rates for these
programs on AFA in its Remand Results.

[8] For example, Commerce first determined identifying and measuring grants does not require a
"specific legal framework guiding government action," but does require that Commerce can
"identify distinct economic actors."  Remand Results 13.  Commerce then identified that the entry
into force of the first Company Law in 1994, which recognized the legal standing of privatized

                                                             (footnote continued)

would have been to evaluate the countervailability of each program from the starting point or year established for a particular category." Id. at 50.  It is reasonably discernible that Commerce categorized the investigated programs by type in order to efficiently allocate its resources.  See id.

Lacking information on the record for certain subsidy programs alleged in the petition, Commerce applied an adverse inference that they were in effect prior to December 11, 2001 and that the respondents benefited from the program.[9]  Remand Results 31.  Commerce used its standard AFA rate selection methodology to apply an AFA rate for these individual programs.[10]  Id. at 31–35.  For the State Key Technology

---

firms and "setting forth principles of business autonomy, responsibility for profits and losses, and right to own assets," represents the threshold where China transitioned "to a phase of economic development where distinct economic actors were legally extended the flexibility to engage in commercial activity."  See id. at 14–15.  Therefore, it is reasonably discernible that Commerce concludes that identifying and measuring all grants requires it to identify benefits to distinct economic actors and match such benefits to individual economic actors.  See id.

[9] Specifically, Commerce applied an adverse inference that the following individual non-recurring subsidy programs were countervailable from the time the category of bestowal was first identifiable and measurable: (1) Export Assistance Grants, Program to Rebate Antidumping Fees, and Grants to Loss-Making SOEs; and (2) Provision of Land and/or Land Use Rights for SOEs for LTAR.  See Remand Results 31–32; 34–35.

[10] For purposes of calculating the AFA rate, Commerce found all alleged programs for which it requested a questionnaire response countervailable because respondents withheld requested information and significantly impeded the proceeding.  See Remand Results 28.  Because the GOC and the mandatory respondents failed to participate, Commerce applied the following hierarchy to select appropriate subsidy rates for the subsidy programs for which it applied AFA:

> (a) [Commerce] first applied, where available, the highest above *de minimis* subsidy rate calculated for an identical program from any segment of this proceeding; (b) absent such a rate, [Commerce] applied, where available, the highest above *de minimis* subsidy rate calculated for a similar program for any segment of this proceeding; (c) absent an above *de minimis* subsidy rate calculated for the same or similar program in any segment of proceeding, [Commerce] applied the highest above *de minimis* calculated subsidy rate for identical, or if not available, a similar program from any CVD proceeding involving the country in which the subject merchandise is produced (*i.e.*,

(footnote continued)

Project Fund grant program, Commerce found it had adequate record information to determine that the program was established on September 10, 1999.  Remand Results 32.  Lacking any information on the usage of the program by individual mandatory respondents prior to December 11, 2001, Commerce inferred that the program conferred a benefit on all mandatory respondents for the years 1999–2001 and applied an AFA rate of 0.58 percent, the highest above de minimis rate calculated from any similar program in any CVD proceeding involving China, to mandatory respondents Changbao Jianli, and Wuxi Seamless Oil Pipe Co., Ltd. ("Wuxi").  Id. at 33.   For mandatory respondent TPCO, although Commerce had information on the company's use of this program from December 11, 2001 through the end of 2008, Commerce states it lacked information on TPCO's use of the program from 1999 through December 11, 2001.  Id.  To fill in the missing information, Commerce added an AFA rate of 0.03 percent to the calculated rate from its final determination of 0.01 (i.e., a combined rate of 0.04 percent) to reflect the inferred benefit received during the years TPCO had not provided a response.   Id.  Commerce found that most of the preferences provided by the exemption of customs duties for the importation of instruments and equipment in the High-Tech Industrial Development Zones program were already properly allocated in its final determination

---

> [China]), provided the producer of the subject merchandise or the industry to which it belongs could have used the program for which the rates were calculated.  Absent an above de minimis rate for the same or similar program from any CVD proceeding involving [China], [Commerce] applied the highest calculated rate from any program in any CVD proceeding for [China].

Id. at 28–29.

because they represented recurring benefits allocated in the year received.[11]  Remand

Results 33.  Nonetheless, Commerce applied an AFA rate of 9.71 percent to this program

to reflect the exemption of customs duties for the importation of instruments and

equipment aspect of the program, which Commerce found is a non-recurring benefit.  Id.

at 33–34.

U.S. Steel argues that the cut-off dates adopted by Commerce for each type of

program are as arbitrary as Commerce's use of China's accession to the WTO in its final

determination.  See U.S. Steel Remand Comments 4–5.  The court labeled Commerce's

selection of China's WTO accession date as arbitrary because Commerce failed to

identify specific economic reforms that occurred on China's accession date and match

those reforms to conditions it deemed necessary to identify and measure subsidies.  TMK

IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1343.  Here, the dates adopted for each type of

subsidy program tie specific reforms to Commerce's ability to identify the sphere of

commercial activity involved, the economic actors involved, and the government action

required to bestow the type of subsidy.  See Remand Results 13–19.   Therefore,

Commerce identifies the dates that specific reforms are implemented and connects those

reforms to the presence of legal conditions it reasonably deemed necessary to identifying

and measuring a particular type of bestowal.  U.S. Steel points to no reason or instance

where one program of a particular type would be identifiable and measurable before

---

[11]  For recurring benefits, Commerce allocates those benefits or expenses to the year in which
the benefit is received.  19 C.F.R. § 351.524(a).  In other words, only recurring benefits bestowed
during the POI could possibly be countervailable.  See id.  Therefore, recurring programs were
unaffected by Commerce's determination to apply a cut-off date for identifying and measuring
non-recurring subsidies.

another program of the same type.  Therefore, Commerce's determination to establish

categories of programs and determine when each type of program would first be

countervailable and measurable is reasonable and consistent with the statutory

obligations to countervail all identifiable and measurable subsidies in a NME country.

U.S. Steel also argues that Commerce's adoption of a uniform cut-off date for each

type of subsidy is arbitrary because it is inconsistent with Commerce's conclusion that the

process of economic reform is uneven and may take hold in some sectors before others.

U.S. Steel Comments 4.  But the court faulted Commerce's adoption of the December 11,

2001 cut-off date as arbitrary because Commerce failed to identify reforms that occurred

on December 11, 2001 or explain how any such reforms permitted it to identify and

measure subsidies.  See TMK IPSCO, 40 CIT __, 179 F. Supp. 3d at 1343.  Even if

reforms identified are uneven and take hold in different sectors of the economy or areas

of the country before others, as U.S. Steel contends, Commerce's investigation of types

of programs focused on the most basic legal conditions that would be necessary to

identify a specific type of subsidy program.  See Remand Results 13–19.  Commerce

cannot, for example, identify and measure the benefit provided by a specific loan to a

specific party before it is possible to identify a loan as a legal, binding contract between

distinct parties generally.  Based on Commerce's logic, it is possible that a specific

program could be identifiable and measurable later than the category of program to which

it belongs, but not earlier.  Commerce has articulated a logical relationship between

specific types of reforms and the legal conditions necessary to permit Commerce to

identify and measure countervailable subsidies for individual actors within the Chinese

economy.  See Remand Results 13–19.  Therefore, in this investigation Commerce's

adoption of a uniform cut-off date for each category of subsidy program is reasonable.

In the alternative, U.S. Steel argues that, even if Commerce's practice of

examining subsidy programs by type is reasonable, the specific cut-off dates adopted for

land-oriented subsidies and credit-oriented subsidies are not supported by substantial

evidence.[12]  U.S. Steel Remand Comments 6–7.  For credit-oriented subsidies, U.S. Steel

"disagrees with Commerce's conclusion that the earliest it could evaluate the

countervailability of credit-oriented subsidies is 1996."  Id. at 6 (citing Remand Results

16).  U.S. Steel focuses on Commerce's acknowledgment that specific economic actors

involved in providing credit in China could be identified as of 1993, and U.S. Steel

contends this evidence renders Commerce's conclusion that credit-oriented subsidies

could not be identified and measured until 1996 unsupported by substantial evidence.  Id.

at 7.   Commerce notes that before a credit-oriented subsidy can be considered

countervailable in an NME, Commerce "needs to be able to identify the loan as a legal,

binding contract between distinct parties."  Remand Results 15.  Although Commerce

says that it could identify specific actors involved in the provision of credit as early as

1993, it is reasonably discernible that Commerce determined the banking sector reforms

leading up to 1993 did not permit the identification of a binding contract between distinct

parties.  See id.  Commerce notes that, until the passage of the 1995 Commercial Bank

Law, commercial banks were not responsible for their own profits and losses, and banks

---

[12] The court considers any substantial evidence challenges to Commerce's determinations of
when it could identify and measure other alleged subsidy programs waived because U.S.
Steel challenges the specific cut-off dates selected for only land-oriented subsidies and credit-oriented
subsidies.  See U.S. Steel Remand Comments 6–7.

lacked legal autonomy from the state.  See id.  In addition, Commerce states that the General Rules on Loans, enacted in 1996, regulated activities related to loans and protected the lawful rights and interests of all parties.  Id. at 15–16.  In particular, Commerce credited the 1996 General Rules on Loans as setting the legal rights and obligations for both lenders and borrowers as providing the legal basis for defining the legal terms of a given loan.   Id. at 16.  Commerce reasonably determined that both the identification of distinct legal actors and the legal underpinnings required to render a loan legally binding are necessary to identifying and measuring credit-oriented subsidies.  See id. at 15–16.  U.S. Steel offers no evidence that the legal requirements to render a loan legally binding between independent economic actors occurred earlier than 1996.  The court declines to reweigh the evidence.

Likewise, for land-oriented subsidies, U.S. Steel argues that Commerce's own analysis indicates that it can identify and measure these subsidies from 1986 when the Land Administration Law first "allowed for the ownership of land-use rights and, in certain circumstances, their transfer."  U.S. Steel Remand Comments 7 (citing Remand Results 18).   U.S. Steel contends, that, although subsequent reforms may have provided additional incentive, it is unreasonable for Commerce to conclude that those reforms were necessary to first identify and measure such subsidies.   Id.  Commerce justified its assessment that the conditions were insufficient to allow for the identification and measurement of land-oriented subsidies in 1986 by highlighting: (1) the fact that the Land Administration law of 1986 conflicted with China's constitution, which banned selling, leasing, and transferring land; and (2) that land-use rights were vague and ill-defined until

the legal framework for basic elements of land transactions took effect in 1999.  <u>Remand</u>

<u>Results</u> 18–19.  The court defers to Commerce's reasonable determination that the legal

framework for the basic elements of property transactions is necessary for identifying and

measuring subsidies.   U.S. Steel highlights no record evidence indicating that the

necessary legal conditions were in place prior to 1999.

## II. Continued Inclusion of the Ocean Freight Quote from Jianli's Freight Forwarder

The court remanded to Commerce to reconsider or further explain its decision to

use an average of two freight quotes from Maersk and Jianli's freight-forwarder because

Commerce had not adequately explained how two such disparate quotes could be

representative of freight prices available to respondents.  <u>See</u> <u>TMK IPSCO</u>, 40 CIT at __,

179 F. Supp. 3d at 1350–51.  U.S. Steel continues to challenge Commerce's explanation.

<u>See</u> U.S. Steel Remand Comments 10–12.  Commerce has now adequately explained

how both quotes could be reflective of market rates and, as a result, its determination is

supported by substantial evidence.

If Commerce determines that the government of a country or any public entity is

providing, directly or indirectly, a countervailable subsidy, then Commerce shall impose a

duty equal to the amount of the benefit conferred by the subsidy subject to certain

adjustments.  <u>See</u> 19 U.S.C. §§ 1671(a),1677(6).  Where a good or service is provided

to a recipient by a government or state-owned entity, if such goods are provided for less

than adequate remuneration, a benefit shall normally be treated as conferred.  <u>See</u> 19

U.S.C. § 1677(5)(E)(iv).   Commerce generally seeks to measure the adequacy of

remuneration by comparing the government price to a market-determined price for the

good from actual transactions in the country in question (i.e., a tier i benchmark).   19 C.F.R. § 351.511(a)(2)(i).   However, if there is no useable market-determined price with which to make the comparison, Commerce will measure the adequacy of remuneration by comparing the government price to a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question" (i.e., a tier ii benchmark).   19 C.F.R. § 351.511(a)(2)(ii).   Further, when measuring the adequacy of remuneration, Commerce must adjust the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product, including delivery charges.   19 C.F.R. § 351.511(a)(2)(iv).   Commerce has broad discretion to determine how to adjust the world market benchmark price to reflect delivery charges, such as freight charges that may be incurred by purchasers so long as such adjustments are reasonable.

On remand, Commerce continued to find that the ocean freight quotes provided by Maersk and by Jianli's freight forwarder are both reflective of market rates that the importer would have paid to import steel rounds and billets notwithstanding the pricing disparity.   Remand Results 42.   Commerce explained that the pricing disparity results from the avenue the importer chooses to import the products, but both paths reflect market rates for ocean freight and are representative of the rates an importer would have paid.   See id. at 43.   Commerce reasoned that working directly with a shipping company may result in a different freight cost than contracting with a freight forwarder that works with a shipping company.   Id.   Commerce supports its conclusion that both the Maersk rate and that of Jianli's freight forwarder are representative of market rates by relying upon a statement from Jianli's freight forwarder explaining that "most shipping companies

and freight forwarders that work with them arrange for the shipment of goods from China

to the destinations identified . . . and then offer lower rates on the China-bound leg of their

voyage." Id. at 42 (citing Jianli Group Submission of Factual Information at Attach. 1, CD

87 (Oct. 5, 2009) ("Jianli Freight Quote")).   Moreover, Commerce concluded that this

"deadfreight rate" is negotiated between the freight forwarder and the shipping company

because the service contracts submitted by Jianli reflect the practice of offering lower

rates on the China-bound leg.[13]   Id. at 43.   Commerce found that record evidence

demonstrates that the prices provided to Jianli by its freight forwarder are actual shipping

charges paid by the freight forwarder's customers, and not solely by Jianli, during the

calendar year 2008, see id. at 54, which coincides with the period of investigation ("POI").

See id. at 3. Therefore, Commerce's determination that Jianli's freight forwarder's freight

pricing reflects market rates that an importer would have paid is supported by substantial

evidence.

        U.S. Steel implies that it is unreasonable to conclude that two freight options

available in the marketplace could be so disparate because no importer would choose

the higher-priced route in such an environment.   See U.S. Steel Remand Comments 11.

It is reasonably discernible that Commerce concluded both the Maersk price quote data

and that of Jianli's freight forwarder are market prices available to importers of steel billets

because no evidence indicates these rates were not available to importers other than

Jianli and market-driven reasons other than price could motivate some importers to

---

[13] Commerce specifically notes that the contracts between Jianli and its freight forwarder include the line item "3.) DEADFREIGHT APPLIES IF FINAL CGO QTTY IS LESS THAN OR CGO DIMENSION IS DIFFERENT FROM DESCRIBED IN PARA2.)"  Remand Results 42 (citing Jianli Freight Quote at Attach. 1).

contract with a freight provider directly rather than through a freight forwarder for a "deadfreight" rate.  See Remand Results 43.  U.S. Steel offers no evidence importers always prefer a "deadfreight" rate that represents the lowest aggregate price at the expense of any other considerations driven by the needs of their business or of their customers.  The court declines to speculate why an importer may have selected a shipping path that may result in a higher aggregate rate or to reweigh the evidence.  The existence of market-driven reasons to prefer either option renders Commerce's determination that both freight rates are market rates supported by substantial evidence.

U.S. Steel also questions the reliability of the rate of Jianli's freight forwarder, implying that it "is not normal market price, but rather a sweetheart deal."  U.S. Steel Remand Comments 11.  However, Commerce references the affidavit provided by Jianli's freight forwarder, which indicates that the prices provided are actual shipping charges paid by the freight forwarder's customers from multiple countries to Shanghai throughout the PO.  Remand Results 54 (citing Jianli Freight Quote at 2–3, Attach. 1).  U.S. Steel provides no record evidence supporting its speculation that the prices reflect a special deal not available to other importers.  In fact, Defendant points out that Jianli's pricing data, which is relied upon by Commerce, reflects a series of transactions from more than one customer throughout the POI.  See Def.'s Resp. United States Steel Corporation's Comments Remand Redetermination 14, Mar. 7, 2017, ECF No. 182.

### III. Exclusion of SBB East Asia Pricing Data From Tier ii Benchmark

The court remanded Commerce's determination to include the SBB East Asia pricing from its tier ii benchmark price for steel rounds and billets because Commerce's inclusion of this pricing data in its benchmark calculation is not supported by substantial

evidence.  See TMK IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1347.  On remand, Commerce determined that the SBB East Asia pricing data should be excluded from its tier ii benchmark pricing for steel rounds.  Remand Results 48.

As already discussed, if there is no useable market-determined price with which to make the comparison, Commerce will measure the adequacy of remuneration by comparing the government price to a world market price "where it is reasonable to conclude that such price would be available to purchasers in the country in question" (i.e., a tier ii benchmark).[14]  19 C.F.R. § 351.511(a)(2)(ii).  Here, Commerce concludes that the fact that the SBB East Asia pricing data could include Chinese import prices presents "a more compelling rationale for removing the data source from [its] benchmark."  Remand Results 48.  To support its determination to move from a tier i benchmark, based on actual transactions in China, to a tier ii benchmark, based on world market prices, Commerce relies on the potential that Chinese prices for steel rounds and billets could distort the SBB East Asia data.  See id.  Commerce reasonably concluded that it could not reconcile including distorted prices in a world market price benchmark.  See id.  No party challenges the exclusion of the SBB East Asia pricing data from Commerce's tier ii benchmark for steel billets and rounds.  Commerce has complied with the court's remand order.

## IV. Subsidy Attribution

The court held that Commerce did not explain what authority allowed it to attribute steel rounds and billets received by one subsidiary of TPCO or Changbao for LTAR to

---

[14] Commerce generally seeks to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good from actual transactions in the country in question (i.e., a tier i benchmark).  19 C.F.R. § 351.511(a)(2)(i).

the consolidated sales of all of each respective parent company's subsidiaries in its final determination.  TMK IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1357–58.  The court remanded to Commerce to explain its attribution methodology or reconsider its determination.  Id., 40 CIT at __, 179 F. Supp. 3d at 1358.  On remand, Commerce reconsidered its determination and agreed it should not have attributed subsidies received by certain TPCO and Changbao subsidiaries to all of each company's respective subsidiaries.  See id. at 38.  In its Remand Results, Commerce attributed subsidies received by Precision to the combined unconsolidated sales of Changbao and to Precision's sales under 19 C.F.R. § 351.525(b)(6)(ii).  Id.  Commerce likewise revisited its attribution of subsidies for the TPCO entities, and declined to attribute subsidies received by TPCO's subsidiaries Tianguan Yuantong Pipe Product Co., Ltd. ("TPCO Yuantong"), Tianjin Pipe Iron Manufacturing Co., Ltd. ("TPCO Iron"), Tianjin Pipe International Economic and Trading Co., Ltd. ("TPCO IETC"), and TPCO Charging Development Co., Ltd. ("TPCO Charging") to all of TPCO's subsidiaries.  See Remand Results 38–39.  Commerce's determinations on remand comply with the court's remand order.

In general, Commerce "calculate[s] an ad valorem subsidy rate by dividing the amount of the benefit allocated to the period of investigation . . . by the sales value during the same period of the product or products to which [Commerce] attributes the subsidy." 19 C.F.R. § 351.525(a).  Ordinarily, Commerce divides the subsidies received by a company only by the sales of that company.  See 19 C.F.R. § 351.525(b)(6)(i).  However, if two or more corporations are cross-owned, Commerce's regulations provide a number

of exceptions to its default attribution rule.[15]  See 19 C.F.R. § 351.525(b)(6)(ii)–(v).  If two

cross-owned corporations produce the same subject merchandise, Commerce will

attribute subsidies received by either or both corporations to the products produced by

both corporations.  19 C.F.R. § 351.525(b)(6)(ii).  If the firm that received a subsidy is a

holding company, including a parent company with its own operations, Commerce will

attribute the subsidy to the consolidated sales of the holding company and its

subsidiaries.  19 C.F.R. § 351.525(b)(6)(iii).  If an input supplier and a downstream

producer are cross-owned, and production of the input product is primarily dedicated to

production of the downstream product, Commerce will attribute subsidies received by the

input producer to the combined sales of the input and downstream products produced by

both corporations (excluding sales between the two corporations).   19 C.F.R.

§ 351.525(b)(6)(iv).  Where the other attribution exceptions do not apply, "if a corporation

producing non-subject merchandise received a subsidy and transferred the subsidy to a

corporation with cross-ownership, [Commerce] will attributed the subsidy to products sold

by the recipient of the transferred subsidy."  19 C.F.R. § 351.525(b)(6)(v).  Commerce

also cumulates subsidies provided to a trading company exporting subject merchandise

with benefits from subsidies provided to a firm producing subject merchandise that is sold

through a trading company regardless of whether those firms are affiliated.  19 C.F.R.

§ 351.525(c).

---

[15] Commerce's regulations define cross ownership as "exist[ing] between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets." 19 C.F.R. § 351.525(6)(vi).

Here, Commerce attributed subsidies received by Precision to the combined unconsolidated sales of Changbao and to sales of Precision under 19 C.F.R. § 351.525(b)(6)(ii) because it found that both corporations are cross-owned and produce subject merchandise.  See Remand Results 38; see also Final Decision Memo at 7–8 (citing Prelim Results, 74 Fed. Reg. at 47,214 (stating that Changbao and Precision are cross-owned and that Precision is a producer of subject merchandise just like Changbao, a mandatory respondent in this investigation).  Commerce applied the same attribution rule to attribute subsidies received by TPCO Yuantong to TPCO because it found that TPCO and its cross-owned subsidiary, TPCO Yuantong, both produced subject merchandise.  Remand Results 38.  In addition, Commerce included service sales in TPCO Yuantong's sales value of subject merchandise because Commerce credited TPCO Yuantong's description of the sales as related to "heat treatment processing."  Id. at 38–39 (citing TPCO Verification Report at 13, PD 271 (Oct. 29, 2009)).  Commerce supported its determination to attribute the steel rounds and billets provided to TPCO Iron under 19 C.F.R § 351.525(b)(6)(iv) to the combined sales of TPCO Iron, TPCO Yuantong, and TPCO, less intercompany sales, by noting that all three companies are cross-owned and TPCO Iron was identified in the investigation as a producer of inputs primarily dedicated to producing downstream products produced by TPCO and TPCO Yuantong. Id. at 39.  Commerce supported its determination to attribute the steel rounds provided at LTAR to TPCO Charging to the unconsolidated sales of TPCO by noting that TPCO Charging does not meet any attribution method under 19 C.F.R. §§ 351.525(b)(6)(ii)–(iv) and that TPCO Charging, which does not produce subject merchandise, provided steel

rounds to TPCO.  Id.; see also Prelim. Results, 74 Fed. Reg. at 47, 215 (stating that

TPCO stated that Charging acts as a trading company and does not produce any

merchandise).  Lastly, Commerce cumulated steel rounds and billets provided for LTAR

to TPCO IETC, which was identified as a trading company, with those received by TPCO

as well benefits received by TPCO's other subsidiaries TPCO Yuantong, and TPCO

Charging.  Id. at 39–40.  Therefore, Commerce used TPCO IETC's total unconsolidated

sales value without removing inter-company sales.  Id. at 39–40.

No party challenges Commerce's attribution methodology.  Commerce has

explained its attribution methodology and supports its attribution methodology by referring

to uncontroverted record evidence.  Therefore, Commerce has complied with the court's

order.

## V.  Provision of Steel Rounds Tied to Production of Subject Merchandise

The court remanded Commerce's decision to attribute the benefit received by

TPCO from the provision of steel rounds at LTAR because the court could not "discern

whether Commerce determined that the provision of steel rounds at LTAR is tied to sales

of seamless pipe."  TMK IPSCO, 40 CIT at __, 179 F. Supp. 3d at 1359.  On remand,

Commerce finds no record evidence as to the purpose or intended use of the steel rounds

and billets under the subsidy program.  See Remand Results 46.  Therefore, Commerce

again attributes the subsidies at issue to TPCO's applicable total sales, not just sales of

seamless pipe.  See id.  U.S. Steel continues to challenge that substantial evidence

supports Commerce's determination.  U.S. Steel Remand Comments 8–10.  The court

disagrees with U.S. Steel.

Commerce attributes the benefits of subsidies to all products exported by a firm. 19 C.F.R. § 351.525(b)(3).   However, if a firm produces more than one product, Commerce will attribute the subsidy only to sales of a particular product if the subsidy is tied to the production or sale of only that product.  See 19 C.F.R. § 351.525(b)(5).  If Commerce cannot determine that the subsidy is tied to the production or sale of a particular product, then Commerce follows its default rule of attributing subsidies to all products exported by the firm.  See 19 C.F.R. §§ 351.525(b)(3), (b)(5).  Commerce has discretion in determining how to evaluate whether a subsidy is tied to the production or sale of a particular product because neither the statute nor Commerce's regulation defines when a subsidy is tied to the production or sale of a particular product.  See 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. §§ 351.525(b)(2), (b)(5).  As a matter of practice Commerce evaluates the purpose of the subsidy based on information available at the time of bestowal and does not trace how the subsidy is actually used by companies.  See id. at 45 (citing Large Residential Washers From the Republic of Korea, 77 Fed. Reg. 75,975 (Dep't Commerce Dec. 26, 2012) (final affirmative CVD determination); and accompanying Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Large Residential Washers from the Republic of Korea at 41, C-580-869, (Dec. 18, 2012), available at http://ia.ita.doc.gov/frn/summary/korea-south/2012-31078-1.pdf (last visited Apr. 28, 2017) ("Large Residential Washers from Korea I&D")).

Here, Commerce attributed the provision of steel rounds and billets at LTAR to all sales of TPCO rather than to only sales of seamless pipe tubes because record evidence

does not establish that the GOC intended the subsidy to benefit or knew that the subsidy

would benefit the production of seamless pipe and tube at the time of bestowal.  Remand

Results 46.   Commerce evaluated the subsidy based upon information at the time of

bestowal and there were no documents or statements from the GOC or from state-owned

producers and suppliers on the purpose or intended use of steel rounds and billets under

the program.  Id. at 46.  U.S. Steel points to no evidence demonstrating that the GOC

intended the subsidy to benefit or knew that the subsidy would benefit the production of

seamless pipe and tube at the time of bestowal.

U.S. Steel contends that the GOC's statement in its response to Commerce's

request for a list of industries in China that directly purchase steel rounds that "[s]teel

rounds (billets in round shape that can be used to produce OCTG) are [purchased] by the

OCTG industry," renders Commerce's conclusion unreasonable.  U.S. Steel Remand

Comments 9 (citing Response of the Government of the People's Republic of China to

the Department's Initial Questionnaire at 49, PD 107 (July 20, 2009)).   However,

Commerce reasoned that "the mere fact that a good 'can be used' does not demonstrate

that the provision of that good is tied to a particular product within the meaning of 19

C.F.R. § 351.525(b)(5)."  Remand Results 53.  In its final determination, Commerce noted

that the GOC states that steel billet was used "in a number of industries, including rebar,

plain bar, merchant bar, light sections, narrow strip, wire rod, and seamless tubes."  Final

Decision Memo at 75.  Moreover, Commerce states that its practice is to only "find that a

subsidy is tied to a particular product when the intended use is known to the subsidy giver

(in this case the GOC) and so acknowledged prior to [or] concurrent with the bestowal of

the subsidy."  Remand Results 46 (citing Countervailing Duties, 63 Fed. Reg. 65,348, 65,403 (Dep't Commerce Nov. 25, 1998) (final rule) (explaining that Commerce looks at information available at the time of bestowal to analyze the purpose of the subsidy)).  The POI for Commerce's investigation of OCTG from China is January 1, 2008 through December 31, 2008.  See id. at 3.  It is therefore reasonably discernible that Commerce concluded that that the GOC's questionnaire response is not an acknowledgment that the purpose of the subsidy is to benefit producers of OCTG prior to or concurrent with the bestowal of the subsidy because the statement was made in response to Commerce's questionnaire issued in 2009.  See id. (citing Countervailing Duties, 63 Fed. Reg. at 65,403).

U.S. Steel also argues that Commerce's statement that the GOC has a policy of "supporting and promoting the production of innovative and high-value added products, including OCTG" contradicts Commerce's tying determination.  U.S. Steel Remand Comments 9 (citing Prelim. Results, 74 Fed. Reg. at 47,217).  It is also reasonably discernible that Commerce did not consider this statement inconsistent with its tying determination because the GOC's acknowledgment of support for one of several products does not mean that it knew and acknowledged prior to or concurrent with the bestowal of the subsidy that the program was intended to benefit any one of those products.  See Remand Results 46 (citing Countervailing Duties, 63 Fed. Reg. at 65,403 (stating that Commerce analyzes the purpose of the subsidy based on information available at the time of bestowal)).

Consol. Court No. 10-00055                                              Page 32

Lastly, U.S. Steel argues that Commerce's tying determination is unsupported because there is no affirmative evidence suggesting that the steel rounds and billets provided at LTAR are used to produce any products other than OCTG.  <u>See</u> U.S. Steel Remand Comments 10.  However, Commerce makes clear that its practice does not consider the actual use of the products provided under the subsidy program in evaluating whether the subsidy program is tied to the production of subject merchandise.  <u>See</u> <u>Remand Results</u> 45 (citing Large Residential Washers from Korea I&D at 41).  Commerce has explained this practice in the past by noting that tracing funds only establishes whether funds are actually used for their stated purpose or the purpose Commerce evinces from record evidence and not whether a benefit is conferred or what specific products the grantor intended to benefit.  <u>See</u> <u>Countervailing Duties</u>, 63 Fed. Reg. at 65,403. U.S. Steel highlights no reason this practice is unreasonable generally or as applied here.  Commerce's determination is therefore supported by substantial evidence.

## CONCLUSION

Therefore, for the reasons discussed, the court sustains the <u>Remand Results</u>. Judgment will enter accordingly.


                                                        <u>/s/ Claire R. Kelly</u>
                                                        Claire R. Kelly, Judge


Dated: May 3, 2017
       New York, New York